## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Anthony Serra,<br><br>        on behalf of himself and all others<br>        similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>New England Patriots LLC,<br><br>                Defendant. | Case No.:  4:24-cv-40022<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Anthony Serra ("Plaintiff") brings this class action against New England Patriots LLC ("Defendant" or "Patriots") in his individual capacity and on behalf of all others similarly situated and alleges as follows based upon personal knowledge as to his own actions, his counsels' investigation, and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff brings this class action lawsuit against Defendant for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. §§ 2710, *et seq.*

2.      The VPPA prohibits "video tape service provider[s]" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b).

3.       The statute accounts for advancements in video-delivery technology by defining a "video tape service provider" broadly to include any business engaged in the "rental, sale, or delivery of prerecorded video cassette tapes or *similar audio visual materials*." *Id.* § 2710(a)(4) (emphasis added).

4.      Defendant developed, owns, and maintains a mobile application titled "New England Patriots" (the "App"), which delivers to consumers live videos and other content relating to the New

1

England Patriots football team.

5.     Plaintiff downloaded and installed the App to his mobile phone and regularly used it to access video content.

6.     Unbeknownst to Plaintiff and Class members, Defendant intentionally and knowingly discloses their data—including which videos they watch, their precise geolocation, and advertising IDs—to third parties, thereby violating the VPPA by disseminating the personally identifiable information of consumers who use the App.

## PARTIES

### I.     Plaintiff Serra

7.     Plaintiff Anthony Serra is a resident of Uxbridge, Massachusetts. In approximately 2019, Plaintiff Serra downloaded the App on his mobile phone, did not create an account, and watched multiple videos thereafter. Plaintiff Serra was not aware that the videos he watched were being reported to third parties.

### II.    Defendant New England Patriots LLC

8.     Defendant New England Patriots LLC is an American football team headquartered in Foxborough, Massachusetts.

## JURISDICTION & VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

10.    This Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint raises a claim under the VPPA, which is a federal statute. 18 U.S.C. § 2710, *et seq.*

11.     Venue is proper in this District because Defendant is headquartered, and thus resides, in this District within the meaning of 28 U.S.C. § 1391 and a substantial part of the acts and omissions alleged herein took place in this District.

12.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I.     The VPPA

13.     Judge Robert Bork, who was critical of the constitutional right to privacy, was nominated to the United States Supreme Court in 1987.[1] In response to this criticism, reporter Michael Dolan obtained Judge Bork's video rental history and published *The Bork Tapes* in the *Washington City Paper*.[2] While "[t]he list of 146 videotapes . . . revealed nothing particularly salacious," the publication "drew bipartisan ire and generated consensus on the importance of intellectual privacy."[3]

14.     Congress passed the VPPA in 1988. The statute imposes liability on "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual

---

[1] *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 Harv. L. Rev. 1766 (2018), *available at* https://harvardlawreview.org/print/vol-131/the-video-privacy-protection-act-as-a-model-intellectual-privacy-statute/.

[2] *Id.*

[3] *Id.* at 1766–67.

materials." *Id.* at (a)(4). "Personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." *Id.* at (a)(3).

## II.    The New England Patriots App

### A.    Setup and Use

15.    Defendant developed, owns, and maintains the App, which Defendant makes available for download through the Google Play Store and the Apple App Store.

16.    On the Google Play Store, the App is shown as being offered by "New England Patriots." On the Apple App Store, the App's seller is Kraft Sports Productions LLC, it is copyrighted by New England Patriots LLC, and the Developer Website links to the New England Patriots' website.

17.    When consumers download the App, they are presented with an option to sign into an existing account, create a new account, or continue without signing in by selecting "MAYBE LATER":



18.     Consumers who select "MAYBE LATER" are not presented with the App's Terms of Use or Privacy Policy.

19.     Even if a user selects "JOIN NOW", they are redirected to a login screen where they have the option to log in, but are not required to view or assent to any terms of use or privacy policy unless they take additional steps to create an account.

20.     Users who actually sign in or sign up for an account are never presented with a privacy policy from Defendant or otherwise that discloses that Defendant will share users' video-

viewing histories with third parties.

21.    After the initial start-up, the App directs users to the home page, where a series of video thumbnails and titles are presented. The user taps on one of these videos to watch it.

**B.    The App gathers consumers' data, which Defendant illegally shares with third parties.**

22.    When a user opens a video on the App, the App sends the content type, video title, and a persistent identifier to the user's device. The App then transmits to third parties the user's information, including location (in geographical coordinates and altitude), advertising ID, and video content consumption.

23.    Defendant shares users' information with Rover[4] and Google by incorporating each company's respective application programming interfaces ("APIs") into the App.

24.    An API "acts as an intermediary layer that processes data transfers between systems, letting companies open their application data and functionality to external third-party developers, business partners, and internal departments within their companies."[5]

25.    When a company implements an API into its application, the API owner—such as Google—will create reports showing, for example, how many daily active users the app has and how many page views the top URLs have received.[6] In exchange for providing these reports, the API owner retains and uses the data it gathers for its own purposes, such as targeted advertising.

26.    Defendant, through APIs provided by Google and Rover, shares its consumers' location, advertising ID, and details about video consumption with those companies.

---

[4] Rover Labs Inc. is a software company which develops data analytics and digital marketing tools for its clients in the sports industry.

[5] IBM, https://www.ibm.com/topics/api.

[6] *Analytics Data API Overview*, Google for Developers, https://developers.google.com/analytics/devguides/reporting/data/v1.

27.     As discussed in greater detail below, Defendant also knowingly and intentionally discloses its user's PII to Google and Rover through their respective APIs so that the APIs can monetize the App in exchange for metrics and other valuable data.

### 1.     Google's Anvato API

28.     Anvato was purchased by Google in 2016 to support its cloud video services.[7] Anvato offers video services, including live videos, video editing, ads, pay-per-view, video publishing, and monetization services. Anvato uses several domains for its service, such as "dcs-vod.mp.lura.live."

29.     The Anvato platform offers "a fully managed, end-to-end video processing and management platform for signal acquisition, live and video-on-demand editing, hybrid encoding, social and premium syndication, dynamic ad insertion, authenticated playback, video analytics and player SDKs across all connected devices."[8]

30.     For example, a user may open the video on the App below titled "Bill Belichick 1/2 'It's a one game season for us.'"

---

[7] Frederic Lardinois, *Google acquires Anvato, a media streaming and monetization platform for broadcasters*, TechCrunch (July 7, 2016), https://techcrunch.com/2016/07/07/google-acquires-anvato-a-media-streaming-and-monetization-platform-for-broadcasters.

[8] *Anvato, Google's complete OTT video platform, now on Google Cloud Platform*, Google (Feb. 8, 2017), https://cloud.google.com/blog/topics/inside-google-cloud/anvato-googles-complete-ott-video-platform-now-on-google-cloud-platform.



31.     An analysis of the App's network traffic has shown that the App then sends the link with the video the user opened to Google through Anvato, enabling Google to identify and track the specific videos viewed by the user.

32.     Among the data Defendant shares with Google and other third parties is the users' geolocation.

33.     "Geolocation is the identification of the real-world geographic location of an object. This identification is done by generating a set of geographic coordinates such as latitude and

longitude through GPS and using the coordinates to determine a meaningful location."[9]

34.     A law professor and privacy researcher at Georgetown University Law Center has explained that "[r]eally precise, longitudinal geolocation information is absolutely impossible to anonymize. D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[10]

35.     Companies collect and leverage a user's geolocation to maximize their advertising revenue. As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."[11]

36.     Defendant uses Google's Anvato to collect and leverage users' geolocation so it can maximize advertising revenue and, to that end, uniquely identify its users. As the former Chief Evangelist for Anvato explained, "we can deliver individual ads even down to the user. If someone is within a couple hundred yards or meters of a coffee shop for example and we have an ad break that comes up the advertiser can target that viewer and give them that ad as they are in close proximity to the store."[12]

37.     On information and belief, the Anvato API can receive a user's precise geolocation with more than three decimal places of accuracy (i.e., within less than forty feet of the

---

[9] *Id.*

[10] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy*, The New York Times (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html

[11] *Id.*

[12] Neil C. Hughes, *63: Anvato End to End Video Streaming & Monetization Platform*, The Techblog Writer (July 1, 2016), https://techblogwriter.co.uk/anvato-end-to-end-video-streaming.

user).[13] In other words, this type of geolocation can be considered precise, as it provides street level accuracy, as noted above.

38.     For users who access the App through an Android device, Defendant also shares a unique advertising ID called an Android Advertising ID ("AAID") for each of its users with third-parties.

39.     As the name suggests, an AAID is a persistent identifier sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[14] Using publicly available resources, an AAID enables a third party to track the user's movements, habits, and activity on mobile applications.[15] That is, an "AAID is the passport for aggregating all of the data about a user in one place."[16]

40.     Companies can use AAID data to generate inferences about an individual's identity, preferences, and affiliations, such as their political or religious affiliations, sexuality, and media preferences.

41.     As one university professor noted, Google's "business model is to collect as much data about you as possible and cross-correlate it so they can try to link your online persona with

---

[13] James R. Schmidt, Jr., BSME, *GPS Coordinates: How Many Decimal Places Do You Need?*, DJS Associates (last visited Jan. 8, 2024), https://www.forensicdjs.com/blog/gps-coordinates-many-decimal-places-need.

[14] *See Advertising ID,* Play Console Help, https://support.google.com/googleplay/android-developer/answer/6048248?hl=en.

[15] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HuffPost (Oct. 19, 2017), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[16] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC (last visited Jan. 8, 2024), https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id.

your offline persona. This tracking is just absolutely essential to their business."[17]

42.    Defendant also shares with Google information about the video content viewed by users of the App.

43.    Google's Anvato provides a dashboard that transparently shows what information Google is collecting, analyzing, and aggregating. This includes what users are watching and where they are watching from. By using this dashboard, Defendant knows that it is disclosing a user's geolocation, AAID, and watch history to Google.[18]

44.    Anvato "incorporate[s] its proprietary Software-based Live Streaming, Live Ad Replacement, Scalable Video Editing, Perceptual Signature, Content Tracking, and OnTarget Monetization."[19]

45.    Perceptual Signature is a technology that produces a searchable, sortable sequence of numbers that simulates the human perception of a video. This signature both accurately and uniquely identifies a video by its content and is small and easy to search.[20]

46.    Using OnTarget Monetization, Google is able to match video content to prospective advertising content: "We integrate with the ad networks and automatically match the videos not only to the page content, but also to the viewers demographics and behavior. . . . Our platform tracks who watched your videos, and how they have engaged with them. We statistically cluster

---

[17] Lily Hay Newman, *The Privacy Battle to Save Google From Itself*, Wired (Nov. 1, 2018), https://www.wired.com/story/google-privacy-data.

[18] *Reporting*, Anvato, https://web.archive.org/web/20180414022726/ http://www.anvato.com/products/reporting/ (archived April 14, 2018 by Wayback Machine).

[19] *Company*, Anvato, https://web.archive.org/web/20180506000434/ http://www.anvato.com/about/company/ (archived May 6, 2018 by Wayback Machine).

[20] *ContentID*, Anvato Knows, https://web.archive.org/web/20151011052405/http://www.anvato.com/technology/contentid/ (archived Oct. 11, 2015 by Wayback Machine).

the audience viewing habits and recommend how they need to be retargeted."[21]

47.     With Anvato's Perceptual Signature technology and the data it receives through its API such as links to specific videos, Google can and does uniquely identify video titles and content that users watch on the App, which it matches to prospective advertising content through Anvato's OnTarget Monetization features.[22]

48.     Defendant transmits the required data to third parties, such as Google and Rover, who can then process, aggregate, analyze, and reorganize it for its own ends. In return, these third parties offer Defendant the ability to "monitor which content is being viewed most in one particular geography, which sites and networks are referring more views to [Defendant's] content, which clips are making the most ad revenue and more,"[23] so that Defendant can increase its own ad revenue.

### 2.     The Rover API

49.     Much like Google's Anvato, Defendant also incorporates an API from Rover, named Rover.io, into the App.

50.     Rover.io was created by Rover Labs Inc., a software company which develops data analytics and digital marketing tools for its clients in the sports industry. Rover develops tools for sports teams to help them understand and market to their fanbases through data collection and

---

[21] *onTarget*, Anvato Knows, https://web.archive.org/web/20130716154721/ http://www.anvato.com/advertisers/ontarget/ (archived July 16, 2023 by Wayback Machine).

[22] *See ContentID*, Anvato Knows, https://web.archive.org/web/20151011052405/ http://www.anvato.com/technology/contentid/ (archived Oct. 11, 2015 by Wayback Machine); *onTarget*, Anvato Knows, https://web.archive.org/web/20130716154721/ http://www.anvato.com/advertisers/ontarget (archived July 16, 2013 by Wayback Machine).

[23] *Syndication*, Anvato, https://web.archive.org/web/20180418182314/ http://www.anvato.com/products/video-syndication (archived Apr. 18, 2018 by Wayback Machine).

analysis.[24] Rover's clients include teams in the NFL and National Hockey League, as well as national Olympic teams.

51.     The Rover API gives Defendant the ability to ingest usage data from users who download the App in order to target them with advertising based on that data. Rover allows developers, like Defendant, to "leverage their experience data in real-time in order to target specific content to the appropriate fans" and target fans effectively through "a variety of factors, including geographic location, device type, seat section." In fact, Rover markets their API on the basis that it can readily "engage and monetize" a fanbase, through personalized experiences created with the data it obtains.[25]

52.     An analysis of the App's network traffic revealed that Defendant transmits to Rover, through the Rover API, a unique device ID and the specific titles of any content viewed in the Patriot's app. Up until some point in late September or early October of 2023, when a user had location services enabled, Defendant also transmitted to Rover, through the Rover API, a user's precise location.

53.     As to the geolocation, Rover API received a user's precise geolocation with altitude, more than six digits of accuracy for latitude, and seven digits of accuracy for longitude— coordinates that are sufficient to identify a user's exact location by GPS.[26] It is unknown why the App ceased sending location information to the Rover API, but the App may resume sending such

---

[24] Rover.io Home Page, https://www.rover.io (last visited Jan. 8, 2024); *see* John Coombs, *Rover is Back*, Rover, https://www.rover.io/blog/rover-is-back (last visited Jan. 8, 2024).

[25] Rover.io Home Page, https://www.rover.io (last visited Jan. 8, 2024).

[26] James R. Schmidt, Jr., *GPS Coordinates: How Many Decimal Places Do You Need?*, DJS Associates, https://www.forensicdjs.com/gps-coordinates-many-decimal-places-need (last visited Jan. 8, 2024).

information at some point in the future.

54.     As to the unique device identifier, Rover API uses a unique string to identify each user's device.[27]

55.     Regarding the content, the Rover API collects the title of the video that was viewed (e.g., "Bill Belichick 1/2: "It's A One Game Season For Us").

56.     Rover's Developer Documentation outlines the process required to implement location tracking within an App on both Android and iOS. This process requires specific affirmative steps to implement; geolocation tracking is not active by default and therefore must be purposefully enabled."[28]

57.     For example, one of the necessary steps to track a user's location is that a developer must implement the Rover's Location module within their app.[29]

58.     This module is not included by default and must be installed and set up during the development of the App. Per Rover's developer documentation: "It's an a-la-carte selection; you can leave off modules (other than the first, core, which is always required) that you don't need for your product. There are various reasons why you may not want to include all the Rover libraries in your project. For instance, you can save method count and APK size by leaving off Rover

---

[27] *Experience Viewed,* Rover Documentation, https://developer.rover.io/v2/big-query/experience-viewed (last visited Jan. 8, 2024).

[28] *Location,* Rover Documentation (iOS), https://developer.rover.io/v2/ios/location (last visited Jan. 8, 2024); *see also Location and Proximity*, Rover Documentation (Android), https://developer.rover.io/v2/android/location-proximity (last visited Jan. 11, 2024); *Location and Proximity*, Rover Documentation, https://developer.rover.io/v2/android/location-proximity/ (last visited Jan. 11, 2024).

[29] *RoverLocation Module*, Rover Documentation (iOS), https://developer.rover.io/v2/ios/modules/location (last visited Jan. 8, 2024); *Location Module*, Rover Documentation (Android), https://developer.rover.io/v2/android/modules/location/ (last visited Jan. 11, 2024).

libraries that you don't need."[30] Further, a developer must set up location authorization prompts and set up when the application transmits the user's location so that it integrates with Rover's Campaigns and Proximity functions."[31]

### C.     Defendant shares its users' PII with Google and Rover to increase advertising revenue and metrics analyzing.

59.     Defendant shares its users' data with third parties through Rover and Google's APIs to increase its own revenue.

60.     Google's Anvato, for example, incorporates "Dynamic Server Side Ad Insertion." Basically, Dynamic Ad Insertion allows Google to target an advertisement to a specific user.

61.     Anvato uses the data it receives from Defendant to fill commercial breaks in videos on the App by transmitting a user's geolocation and other PII to an "ad server." The ad server then auctions this PII to prospective advertisers. The highest bidder wins the opportunity to advertise on that particular user's video stream.

62.     This advertising scheme is far different from how advertising is conducted for cable and broadcast television—where commercial space is purchased for specific regions and times, such that viewers who watch the same program at the same time will see the same advertisement. Anvato has used the below graphic to illustrate this concept:[32]

---

[30] *Installation and Initialization*, Rover Documentation (iOS), https://developer.rover.io/ v2/ios/ (last visited Jan. 11, 2024); *Installation and Initialization*, Rover Documentation (Android, https://developer.rover.io/v2/android (last visited Jan. 11, 2024).

[31] *Location*, Rover Documentation (iOS), https://developer.rover.io/v2/ios/location (last visited Jan. 11, 2024); *see also Location*, Rover Documentation, https://developer.rover.io/v2/ android/location-proximity (last visited Jan. 8, 2024); *Location and Proximity*, Rover Documentation (Android), https://developer.rover.io/v2/android/location-proximity/ (last visited Jan. 11, 2024).

[32] *Dynamic Video Ad Insertion*, Anvato, https://web.archive.org/web/20180410050650/ http://www.anvato.com/products/dynamic-server-side-ad-insertion/ (archived Apr. 10, 2018 by Wayback Machine).



63.     Through Defendant's dissemination of consumers' PII, third parties such as Google can "collect and store billions of metrics and events and make it easier for [clients] to make data-driven decisions," and these reports are "continuously updated and metrics are reported as they occur."[33]

64.     In light of the foregoing, there is no doubt that Defendant knowingly and intentionally disclosed its users' PII, including their video viewing data, to third parties for its own benefit.

## **CLASS ALLEGATIONS**

65.     Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

---

[33] *Reporting*, Anvato, https://web.archive.org/web/20180414022726/ http://www.anvato.com/products/reporting/ (archived Apr. 18, 2018 by Wayback Machine).

66.     The Class that Plaintiff seeks to represent is defined as follows:

All persons in the United States who used the Patriots App to watch videos and had their personally identifiable information—including but not limited to the videos they watched, their geolocation, and their unique advertising IDs—transmitted to one or more third parties.

67.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

68.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

69.     The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over one million individuals whose PII may have been improperly shared with third parties, and the Class is identifiable within Defendant's records.

70.     Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class members. These include:

    a.  Whether Defendant collected Plaintiff's and Class Members' PII;

    b.  Whether Defendant unlawfully disclosed and continues to unlawfully disclose Plaintiff's and Class Members' PII;

    c.  Whether such disclosure by Defendant violates the VPPA;

    d.  Whether such disclosure by Defendant was knowing and intentional; and

    e.  Whether such disclosure was made without Plaintiff and Class members' consent.

71.     Plaintiff's claims are typical of those of other Class members because all downloaded and used the App and consequently had their video-viewing information and PII collected and shared by Defendant.

72.     Plaintiff will fairly and adequately represent and protect the interests of the Class members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

73.     Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense, including the toll on judicial resources, that hundreds of individual actions would require.

74.     This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's actions challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these actions hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

75.     The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

76.     The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

77.     Unless a classwide injunction is issued, Defendant may continue disclosing the private information of Class members, Defendant may continue to disclose Plaintiff and Class members' PII as complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

78.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

79.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

        a.   Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' PII;

    b.  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

    c.  Whether Defendant failed to comply with its own policies and applicable laws regulations, and industry standards relating to data security;

    d.  Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII would be disclosed to third parties;

    e.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

    f.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

### CLAIMS FOR RELIEF

**COUNT I**
**Violation of the VPPA**
**18 U.S.C. § 2710, *et seq.***

80.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

81.    Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" by providing prerecorded digital videos to consumers via the App. 18 U.S.C. § 2710(a)(4).

82.    Plaintiff and Class Members are "consumers" as defined by the VPPA because they downloaded, installed, and watched videos using the App. 18 U.S.C. § 2710(a)(1). Plaintiff and Class Members are therefore "subscribers" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1); *see Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016).

83.    Plaintiff and Class Members watched videos Defendants provided via the App. On information and belief, Defendants obtained Plaintiff and Class Members' PII through the App

and then disclosed that PII—including the device's Advertising ID, precise geolocation, and records of the videos that they viewed—to third parties.

84.     Under the VPPA, "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

85.     The information Defendants shared with third parties constitutes "personally identifiable information" because it allows those third parties to identify Plaintiff and Class members. *Yershov*, 820 F.3d at 486.

86.     Plaintiff and members of the Classes did not consent to the disclosure of their PII to third parties, nor in the manner required by 18 U.S.C. § 2710(b)(2)(B).

87.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); (iv) reasonable attorneys' fees and costs and other litigation expenses; and (v) other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, requests judgment against Defendant and that the Court grant the following:

A.     For an Order certifying the Class under Rule 23 of the Federal Rule of Civil Procedure and appointing Plaintiff and Counsel to represent such Class;

B.     For an order declaring that Defendant's conduct violates the VPPA;

C.     For equitable and injunctive relief, including but not limited to, enjoining

Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

D.      For an award of damages, including, but not limited to, actual, consequential, punitive, statutory, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.


Dated: February 1, 2024                    Respectfully Submitted,

                                           **BERMAN TABACCO**

                                           */s/ Nathaniel L. Orenstein*
                                           Nathaniel L. Orenstein (BBO #664513)
                                           Patrick T. Egan (BBO #637477)
                                           Christina L. Gregg (BBO #709220)
                                           One Liberty Square
                                           Boston, MA 02109
                                           Telephone: (617) 542-8300
                                           norenstein@bermantabacco.com
                                           pegan@bermantabacco.com
                                           cgregg@bermantabacco.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Joe E. Nelson
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: 612-333-8844
Fax: 612-339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
jnelson@gustafsongluek.com

Kenneth A. Wexler
Justin N. Boley
Zoran Tasić
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Drive, Suite 5450,
Chicago, IL 60606
Tel: 312-346-2222
Fax: 312-346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com

Kevin Landau
Brett Cebulash
Joshua O. Hall
TAUS, CEBULASH & LANDAU, LLP
123 William Street, Suite 1900A,
New York, NY 10038
Tel: 212-931-0704
klandau@tcllaw.com
bcebulash@tcllaw.com
jhall@tcllaw.com

***Attorneys for Plaintiff and the Proposed
Class***