## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY SERRA,<br><br>on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEW ENGLAND PATRIOTS LLC,<br><br>Defendant. | Case No.: 4:24-cv-40022-MRG |

### MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Anthony Serra ("Plaintiff") respectfully submits this Opposition to Defendant New England Patriots LLC's Motion to Dismiss Plaintiff's Complaint.

### <u>INTRODUCTION</u>

This case involves a straightforward application of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Congress passed the VPPA in response to the publishing of Judge Robert Bork's video rental history after he was nominated to the Supreme Court. The intent of the VPPA is "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-1. "To effectuate this purpose, Congress in the VPPA created a civil remedy against a 'video tape service provider' for 'knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider.'" *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)).

Defendant is a video tape service provider who violated the VPPA by sharing Plaintiff and class members' personal identifying information ("PII") with third parties each time they

watched a video on the Patriots mobile application ("the App"). Defendant shared PII with two technology marketing companies—Google and Rover. The shared PII included (at least) Plaintiff and class members' precise geolocation when watching a video, their unique advertising ID, and information detailing the videos they consumed.

As discussed in more detail below, Plaintiff's Complaint[1] states a VPPA cause of action under the First Circuit's decision in *Yershov*, which examined allegations closely analogous to those that Plaintiff makes here and held that those allegations stated a claim under the VPPA. Tellingly, in seeking to dismiss Plaintiff's Complaint, Defendant relies heavily on out-of-circuit case law that is inconsistent with *Yershov* and attempts to inject factual issues into the case that are not appropriate for consideration on a motion to dismiss.

First, Defendant argues that Plaintiff and class members fail to meet the statutory definition of a "subscriber" (and thus "consumer") under the VPPA because they were not required to have their geolocation enabled as a condition for using the App. No such requirement exists. As the First Circuit explained in *Yershov*, a consumer's download of a content provider's app demonstrates a continuing relationship with the content provider sufficient to make the consumer a "subscriber" under the VPPA. Regardless, Plaintiff alleges that Defendant *did* in fact obtain Plaintiff and class members' geolocation, and Defendant's assertions to the contrary must be rejected at the pleading stage.

Second, Defendant argues that the information it collects is not PII. But Plaintiff's well-plead allegations concerning the PII collected and shared are nearly identical to those made by

---

[1] The "Complaint" (or "Compl.") is the Class Action Complaint filed on Feb. 1, 2024, ECF No. 1.

the plaintiffs in *Yershov*, which the *Yershov* court ruled was sufficient to state a claim under the VPPA.

Third, Defendant argues that Plaintiff offers only "labels and conclusions" when alleging that Defendant knowingly shared the PII with third parties. Defendant's argument ignores Plaintiff's allegations that Defendant knew it was sharing PII because Google and Rover would provide analytics that allowed Defendant to direct targeted ads to specific users in exchange for data from the Defendant.

Fourth, Defendant argues that two exceptions to the VPPA apply: the "ordinary course of business exception," which allows the disclosure of certain PII if it is incident to other ordinary business activities such as processing orders or requests; and the "marketing exception," which allows a publisher to disclose specific video content if it does so exclusively for marketing purposes. But Defendant's disclosures were not merely incident to other ordinary business activities. And the marketing exception does not apply because Defendant does not provide users an opportunity to prohibit disclosure of their PII. In the absence of such an opportunity, the marketing exception does not apply. Regardless, the disclosures that Defendant makes to third parties regarding users' precise geolocation, advertising ID, and video content consumption far exceed what is contemplated under the marketing exception, which is limited to the sharing of users' names and addresses.

Finally, Defendant argues that Plaintiff's claim is time barred because he downloaded the App in 2019 and the VPPA's statute of limitations is two years. Defendant's argument is based on a selective reading of the Complaint and ignores allegations that Plaintiff has continued to watch videos on the Patriots App within the statute of limitations.

Defendant's motion should be denied in its entirety.

**STATEMENT OF FACTS**

Defendant developed, owns, and maintains the App and makes it available for consumers to download through the Google Play Store and Apple App Store. Compl. ¶ 15. Consumers are not required to assent to the terms of use or the privacy policy before making use of the App. *Id.* ¶¶ 18–20. Once in the App, consumers are presented with video titles and thumbnails, and they can proceed to watch videos or view other content. *Id.* ¶ 21. The App incorporates two application programming interfaces ("APIs")—Anvato and Rover—that collect personally identifiable information about consumers as they use the App.[2] This information includes the consumers' precise geolocations, their unique advertising IDs, as well as details about any videos that they have viewed. *Id.* ¶¶ 21–26.

The Anvato API, which is owned by Google, offers developers such as Defendant (among other things) a fully managed, end-to-end video processing and management platform for signal acquisition, and a means for dynamic ad insertion and video analytics. Compl. ¶¶ 28–29. The Rover API, which is owned by Rover Labs ("Rover"), helps sports teams understand and market to their fanbases by collecting and analyzing app usage data in order to better target users with content and advertising. *Id.* ¶¶ 50–53.

Defendant's App transmits the following PII to Google through the Anvato API: (1) a consumer's geolocation data within more than three decimal places of accuracy, Compl. ¶ 37; (2) a link to any video watched by a consumer, *id.* ¶ 31; and (3) an Android Advertising ID ("AAID"), a persistent advertising ID unique to each user which can be used to draw inferences

---

[2] "An API 'acts as an intermediary layer that processes data transfers between systems, letting companies open their application data and functionality to external third-party developers, business partners, and internal departments within their companies.'" Compl. ¶ 24.

about the individual's identity, preferences, and affiliations, such as political or religious affiliations, sexuality, and media preferences. *Id.* ¶¶ 38–40. With Anvato's technology and the data it receives through its API (such as links to specific videos), Google can and does uniquely identify video titles and content that users watch on the App, which it then matches to prospective advertising content. *Id.* ¶ 47. Anvato provides Defendant with a dashboard that transparently shows what information Google is collecting, analyzing, and aggregating. *Id.* ¶ 43. This includes what users are watching and where they are watching from. *Id.* By using this dashboard, Defendant knows that it is disclosing a user's geolocation, AAID, and watch history to Google. *Id.*

Similarly, the Rover API transmits the following PII to Rover: (1) a unique device ID, (2) the specific titles of any content viewed in the App, and (3) until at least October 2023, precise geolocation data regarding the user. Compl. ¶¶ 52–53. The data shared by Defendant through the Anvato and Rover APIs is used by Google and Rover to better understand and target consumers with advertising as a core part of their business model. *See id*. ¶¶ 59–64.

Plaintiff Anthony Serra, a resident of Massachusetts, downloaded the App on his mobile phone around 2019. Unbeknownst to him, Defendant shared the videos he had watched on the App, his precise geolocation, and his unique advertising ID with these third parties. *Id.* ¶¶ 6–7.

### ARGUMENT

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Yershov*, 820 F.3d at 485 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this "make-or-break standard," a claim has facial plausibility "when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Saunders v. Hearst Television, Inc.*, No. 23-CV-10998-RGS, 2024 WL 126186, at *2 (D. Mass. Jan. 11,

2024) (quoting *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)).

The First Circuit has repeatedly "cautioned against converting *Twombly's* mandates into a

requirement that . . . plaintiffs provide evidentiary support" for their allegations. *See In re*

*Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549 (1st Cir. 2016) (citation omitted).

     Typically, when considering a motion to dismiss "the deciding court cannot consider

information outside the four corners of the complaint." *Alharbi v. Beck*, 62 F. Supp. 3d 202, 205

(D. Mass. 2014). The First Circuit recognizes four narrow exceptions to this rule: "for documents

the authenticity of which are not disputed by the parties; for official public records; for

documents central to plaintiffs' claim; or for documents sufficiently referred to in the

complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Pursuant to Fed. R. Civ. P. 12(d), if

the Court considers materials outside the exceptions, "the motion must be treated as one for

summary judgment under Rule 56. All parties must be given a reasonable opportunity to present

all the material that is pertinent to the motion." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12,

17 (1st Cir. 1998) (discussing conversion of Rule 12(b)(6) motion into Rule 56 motion).

However, "at this early stage of the litigation before any discovery has taken place … [t]he wiser

course is to allow the parties to engage in discovery, to see if the parties are able to narrow the

factual disputes." *Shulse ex rel. Shulse v. W. New England Univ.*, No. 3:19-cv-30146-KAR, 2020

WL 4474274, at *2 (D. Mass. Aug. 4, 2020) (quoting *Crosby Legacy Co., LLC v. TechnipFMC*

*PLC*, No. CV 18-10814-MLW, 2019 WL 5588993, at *6 (D. Mass. Sept. 13, 2019)) (declining to

convert the motion to dismiss into a motion for summary judgment).

## A. Plaintiffs are "Subscribers," and thus "Consumers" under the VPPA as defined in *Yershov*.

     To state a claim under the VPPA, an individual must qualify as a "consumer" under

18 U.S.C. § 2710(a)(1), which defines "consumer" to mean a "renter, purchaser, or subscriber of

goods or services from a video tape service provider." Plaintiff is a "subscriber" to the App as defined under the First Circuit's decision in *Yershov*, which holds that a consumer's download and use of a company's mobile application establishes a relationship between the parties and makes the consumer a "subscriber" under the VPPA:

> [A]nother dictionary defines "subscribe" as "[t]o receive or be allowed to access electronic texts or services by subscription" with "subscription" defined, in turn, to include "[a]n agreement to receive or be given access to electronic texts or services." This is just what we have here: Gannett offered and Yershov accepted Gannett's proprietary mobile device application as a tool for directly receiving access to Gannett's electronic text and videos without going through other distribution channels, much like how a newspaper subscriber in 1988 could, if he wished, retrieve a copy of the paper in a box at the end of his driveway without having to go look for it at a store.

820 F.3d at 487 (citation omitted).

   *Yershov* is controlling and analogous to the situation here. Plaintiff accepted Defendant's offer to download and use the App "as a tool for directly receiving access to [Defendant's] electronic text and videos without going through other distribution channels." 820 F.3d at 487. Plaintiff's use of the App to access Patriots videos makes him a subscriber under the VPPA just as the *Yershov* plaintiff's acceptance of Gannett's offer to download and receive Gannett content through the Gannett app made him a subscriber.

   Defendant argues that to be considered a subscriber under the VPPA, Plaintiff must meet a different standard—one that includes some form of consideration. Def.'s Mem. 7. This argument relies on the Eleventh Circuit's decision in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), but the *Yershov* court considered and rejected the *Ellis* court's reasoning. The *Yershov* court explained that rules of statutory construction require a statute to be read so as to not have superfluous terms, and requiring some type of consideration to be considered a "subscriber" would render "subscriber" superfluous in light of the statute's use of the terms "renter" and "purchaser"—which undoubtedly require the consumer to provide

consideration—immediately before "subscriber." *Yershov*, 820 F.3d at 487–88. The court further

reasoned that offering free videos to entice consumers to form a more lasting relationship would

not preclude someone from being considered a "subscriber" in the brick-and-mortar world to

which the VPPA's protections clearly apply, so it should not preclude that result in the digital

world:

> Consider, too, the reasonably common retailing practice of introductory
> enticements. Suppose a customer in 1988 obtained several videos from a new
> commercial supplier at no charge, or with money back. We can discern no reason
> why Congress would have wanted different disclosure rules to apply to those
> transactions than to ones where a monetary payment is made. And because we think
> that Congress cast such a broadly inclusive net in the brick-and-mortar world, we
> see no reason to construe its words as casting a less inclusive net in the electronic
> world when the language does not compel that we do so.

*Id.* at 488.

Defendant ignores the binding precedent established by *Yershov* and focuses instead on

misread dicta from the case to argue that there is no violation of the VPPA absent a

bargained-for exchange between the content provider and the consumer. Not so. The *Yershov*

court simply noted that it disagreed with the *Ellis* court's characterization of the transaction as

the consumer providing no value to the content provider. It noted that the defendant content

provider in that case obtained valuable information from the subscriber—"his Android ID and

his mobile device's GPS location at the time he viewed a video, each linked to his viewing

selections." 820 F.3d at 489. That is precisely the information Defendant obtained from Plaintiff

and the proposed class here. Compl. ¶¶ 9, 22–27. Defendant's assertion that it did not require

Plaintiff or class members to have their geolocation toggled on as a condition of using the App is

irrelevant—especially when Defendant does not dispute Plaintiff's allegations that it collected

that valuable information from Plaintiff and class members. Simply put, Plaintiff is a

"subscriber" as defined in *Yershov* and under the facts alleged in the Complaint.

**B. Consistent with the First Circuit's opinion in *Yershov*, Plaintiff's allegations are sufficient to plead that the Anvato and Rover APIs collect personally identifiable information.**

   **1. Plaintiff's allegations that the Anvato API collects PII of the App users and disseminates that information to Google—which must be credited at the pleading stage—are sufficient to defeat Defendant's motion to dismiss.**

Defendant maintains that Plaintiff "fails to allege that Anvato can link PII it allegedly collects to an individual, or that the information it allegedly collects even qualifies as PII." Def.'s Mem. 11. This argument fails because it is contrary to the First Circuit's application of the VPPA in *Yershov*.

Like Plaintiff here, the plaintiffs in *Yershov* alleged that the defendant's app—which "allow[ed] users to access news and entertainment media content, including videos, on their mobile devices"—sent PII to a third party (Adobe) every time a user viewed a video on the app. 820 F.3d at 484. The information that was allegedly transmitted consisted of "(1) the title of the video viewed, (2) the GPS coordinates of the device at the time the video was viewed, and (3) certain identifiers associated with the user's device, such as its unique Android ID." *Id.*

The *Yershov* court rejected the defendant's argument that the information the app conveyed to a third party was not PII, holding that the plaintiff's factual allegations were sufficient to conclude at the pleading stage that the information conveyed by the app constituted PII. In reaching this conclusion, the court noted (among other things) "that PII is not limited to information that explicitly names a person," and that "[m]any types of information other than a name can easily identify a person." 820 F.3d at 486. The court used an example to illustrate how the information disclosed by the app was PII because it "effectively reveal[ed] the name of the video viewer": imagine, the court said, that the defendant

   had disclosed that a person viewed 146 videos on a single device at 2 sets of specified GPS coordinates. Given how easy it is to locate a GPS coordinate on a

– 9 –

street map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer.

*Yershov*, 820 F.3d at 486.

The information that is allegedly collected by Google's Anvato API constitutes PII under the VPPA because it is effectively identical to the information collected in *Yershov*, as illustrated by the following table:

| Type of information | PII collected in *Yershov* | Analogous data collected by the Anvato API in this case |
|---|---|---|
| Video viewed | The title of the video viewed. *Yershov*, 820 F.3d at 484. | "[T]he link with the video the user opened . . . ." Compl. ¶ 31. |
| Location of user | The GPS coordinates of the device at the time the video was viewed. *Id.* | "[A] user's precise geolocation with more than three decimal places of accuracy," which "provides street level accuracy." Compl. ¶ 37. |
| Unique ID | The unique Android ID of the user's device. *Id.* | "[A] unique advertising ID called an Android Advertising ID ('AAID')," which "is a persistent identifier sent to advertisers and other third parties so they can track user activity across multiple mobile applications." Compl. ¶¶ 38–39. |

In addition to ignoring that the information transmitted to Google via the Anvato API is effectively identical to the PII transmitted in *Yershov*, Defendant here contends that the information that Defendant conveys to Google is not PII because Plaintiff's Complaint "does not allege that Google actually combines these discrete pieces of information into a profile that ultimately enabl[es] it to identify and track the specific videos viewed by the user." Def.'s Mem. 11 (citation and quotation marks omitted).

Defendant's contention is beside the point, as the First Circuit made clear in *Yershov*. The proper standard for determining whether information constitutes PII is not whether a third party "actually combines . . . the information into a profile" (Def.'s Mem. 11) that enables

– 10 –

identification but whether the "disclosed information [is] *reasonably and foreseeably likely to reveal* which . . . videos [the user] has obtained." *Yershov*, 820 F.3d at 486 (emphasis added). As in *Yershov*, the information allegedly collected by the Anvato API is PII because it "effectively reveal[s] the name of the viewer" by conveying, among other things, GPS coordinates that "would enable most people to identify what are likely the home and work addresses of the viewer," thereby making it possible to match a viewed video to the person who viewed it. *Id.*

Notably, arguments identical to those raised by Defendant here were made and squarely rejected in a recent VPPA case in this Circuit, *Louth v. NFL Enters. LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866 (D.R.I. Sept. 12, 2022). In *Louth*, the plaintiffs alleged that the NFL's mobile app, through which users could view game videos, disseminated users' PII to Google through the Anvato API—the same API that is at issue here. *Id.* at *1. The *Louth* plaintiffs likewise alleged that the NFL "disclose[d] to Google via the Anvato API" the same information Plaintiff alleges is disclosed here: "geolocation, a user's unique advertising ID ('AAID'), and the unique video identifier of the videos viewed by the user." *Id.* at *2.

Applying the First Circuit's analysis in *Yershov*, the *Louth* court concluded that "[t]he plaintiff [had] sufficiently allege[d] that AAID is PII because it is 'unique both to a specific device and user' and allows Google 'to identify and track specific users across multiple electronic devices, applications, and services that a consumer may use.'" *Id.* at *3; *see* Compl. ¶ 39 ("AAID is a persistent identifier sent to advertisers and other third parties so they can track user activity across multiple mobile applications. Using publicly available resources, an AAID enables a third party to track the user's movements, habits, and activity on mobile applications. That is, an AAID is the passport for aggregating all of the data about a user in one place." (citation and internal quotation marks omitted)). The *Louth* court went on to conclude that the

information conveyed to Google by the Anvato API—precise geolocation data, AAID, and video ID—"constitutes PII because it is 'reasonably and foreseeably likely to reveal which [NFL] vides [the plaintiff] has obtained.'" 2022 WL 4130866, at *3 (quoting *Yershov*, 820 F.3d at 486).

Defendant also asserts that the Complaint does not "allege that Anvato collects information that identifies the 'specific video materials' Plaintiff watched or requested. Def.'s Mem. 13. This is simply false, as Plaintiff alleges that, "[w]ith Anvato's Perceptual Signature technology and the data it receives through its API such as links to specific videos, Google *can and does* uniquely identify video titles and content that users watch on the App." Compl. ¶ 47 (emphasis added). Plaintiff's allegations regarding the Anvato dashboard which provides information about "what users are watching and where they are watching from" further undermines Defendant's assertion that the Complaint fails to allege Anvato's collection of information that identifies specific videos viewed by the user. *Id*. at ¶ 43.

In light of the First Circuit's analysis in *Yershov*—and the persuasive application of that analysis in *Louth*—there is no question that Plaintiff has sufficiently alleged in his Complaint that the information conveyed to Google by the Anvato API constitutes PII under the VPPA.

**2. As with Google's Anvato API, Plaintiff's allegations are sufficient to plead that the Rover API collects and transmits the PII of App users.**

Defendant also argues that Plaintiff's allegations are insufficient to plead that the Rover API collects PII. These arguments are identical to those that Defendant raises regarding the information collected by the Anvato API and must be rejected for the same reasons.

There is one twist: While Defendant acknowledges Plaintiff's allegations that the Anvato API collects geolocation data, Defendant asserts that the Complaint fails to allege that the *Rover* API does so. Def.'s Mem. 10 ("The Complaint tellingly lacks any allegations that *Rover* can or

does collect any information that connects an individual's GPS coordinates or unique identifier with the video information collected by the App.").

Like Defendant's assertion that Plaintiff fails to allege that the Anvato API collects information identifying videos viewed by the user, this assertion is false. Plaintiff *does* allege that Rover collects a unique device ID, the titles of the videos viewed, and the user's precise location:

> An analysis of the App's network traffic revealed that Defendant transmits to Rover, through the Rover API, a unique device ID *and the specific titles of any content viewed in the Patriot's app*. Up until some point in late September or early October of 2023, when a user had location services enabled, Defendant also transmitted to Rover, through the Rover API, a user's precise location ….It is unknown why the App ceased sending location information to the Rover API, but the App may resume sending such information at some point in the future.

Compl. ¶¶ 52–53 (emphasis added). While Plaintiff does not allege that the Rover API *currently* transmits the user's location, this is irrelevant as the Complaint alleges that such information was collected as recently as nine months ago, well within the VPPA's two-year statute of limitations. 18 U.S.C. § 2710(c)(3).

Defendant's arguments are wide of the mark because they ignore Plaintiff's allegations regarding the information that is collected by the App and transmitted by the Rover API. Defendant insists that the Court in *Yershov* held that identification of an individual "require[s] a combination of three different types of data—precise geolocation information, an android ID number, and video title information," and that Plaintiff here has failed to plead that the Rover API transmits PII because the Complaint here "does not allege an analogous combination." Def.'s Mem. 9. But again, Plaintiff *does* allege that the Rover API transmits a combination of information that is analogous to the information at issue in *Yershov*: (1) "precise geolocation with altitude, more than six digits of accuracy for latitude, and seven digits of accuracy for longitude—coordinates that are sufficient to identify a user's exact location by GPS," (2) "a

unique device ID," and (3) "the specific titles of any content viewed in the Patriot's app." Compl. ¶¶ 52–53.

As with Plaintiff's allegations regarding the information transmitted by the Anvato API, the allegations regarding the information transmitted by the Rover API are sufficient to plead that the information constitutes PII under the VPPA. Defendant's arguments to the contrary invite this Court to ignore Plaintiff's allegations of fact and must therefore be rejected. *See In re Denver*, 626 F. Supp. 3d 512, 515 (D. Mass. 2022) ("In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff." (citing *Gilbert v. City of Chicopee*, 915 F.3d 74, 76, 80 (1st Cir. 2019)).

**C. Plaintiff's allegations regarding Defendant's state of mind are sufficient at the pleading stage, as reflected by the decisions of district courts in this Circuit that have considered nearly identical allegations and concluded that they sufficiently plead knowledge.**

Defendant maintains that the Complaint is bereft of any allegations that Defendant knew that the Anvato and Rover APIs were transmitting PII to third parties. Def.'s Mem. 14–15. Instead, Defendant insists, "Plaintiff offers only 'labels and conclusions.'" *Id.* at 15; *see also id.* at 14 ("[Plaintiff] offers mere conclusions that the Patriots 'knowingly and intentionally disclose[ ] . . . user's [sic] PII to Google['s Anvato and Rover].'" (quoting Compl. ¶ 27)).

But courts in this circuit have recognized that a complaint adequately pleads knowledge in the context of the VPPA by alleging that Defendant "knew that it was collecting data from users that identified personalized information about them because, in exchange for the data, [third parties] provided [Defendant] with analytics allowing it to provide advertisements tailored to specific users." *Saunders*, 2024 WL 126186, at *4 (citations omitted). Plaintiff's allegations regarding Defendant's use of the Rover API are similar and therefore sufficient to plead Defendant's knowledge. *See, e.g.*, Compl. ¶ 51 ("The Rover API gives Defendant the ability to

– 14 –

ingest usage data from users who download the App in order to target them with advertising based on that data. Rover allows developers, like Defendant, to 'leverage their experience data in real-time in order to target specific content to the appropriate fans' and target fans effectively through 'a variety of factors, including geographic location, device type, seat section.'").

The district court in *Louth* came to the same conclusion when analyzing allegations regarding the NFL's knowledge that the Anvato API transmitted PII:

> As alleged, the Avanto dashboard transparently shows what information Google is collecting, analyzing, and aggregating. This includes what users are watching and where they are watching. By using these dashboards, the plaintiff asserts, NFL Enterprises knows that it is disclosing a user's geolocation, AAID, and watch history to Google.

> Given the facts alleged, it can reasonably be inferred that NFL Enterprises knowingly transmits PII for the purpose of targeted advertising.

*Louth*, 2022 WL 4130866, at *3 (citations omitted).

As in *Louth*, Plaintiff has adequately pleaded Defendant's knowledge by alleging that, through its use of the Google Anvato dashboard, "Defendant knows that it is disclosing a user's geolocation, AAID, and watch history to Google." Compl. ¶ 43.[3]

---

[3] Defendant argues that a graphic of a sample dashboard they submit as Exhibit A to the Greenbaum Declaration (ECF No. 47-1) undermines Plaintiff's claim because it shows Anvato collects and shares "aggregate, anonymized data that cannot be matched" (Def.'s Mem. 14). As an initial matter, Defendant acknowledges that this is a sample and discovery will reveal the actual dashboard that Anvato and Patriots shared. More importantly, Defendant fails to mention that, within the same document, Anvato explains—consistent with Plaintiff's allegations—that the service allows customers to "see who is watching the most ads, where they're being watched and which ones are earning the most revenue." ECF No. 47-1, at 5. At a minimum, discovery (and possibly expert analysis) is necessary to understand what and how Anvato collects and shares data.

**D.  The alleged uses of Plaintiff's personally identifiable information—marketing, advertising, and analytics—do not fall within the VPPA's narrow list of permissible uses under the business exception.**

Defendant next argues that the "knowing disclosure of PII through the Anvato API . . . fall[s] within the VPPA's 'ordinary course of business exception'" because "Anvato 'manage[s] and operat[es]' the App's *video services*." Def.'s Mem. 16–17.

This is yet another argument that was squarely rejected by the court in *Louth* and should likewise be rejected here. The *Louth* court's analysis applies equally here: "Viewing the alleged facts in the light most favorable to the plaintiff, . . . [Defendant] discloses PII to Google to measure analytics and increase advertising revenue. Such purposes do not fall into the narrow categories statutorily defined as the 'ordinary course of business.'" *Louth*, 2022 WL 4130866, at *4.

In short, Plaintiff's allegations regarding the purposes for which Google's Anvato API collects PII must be taken as true, and "[t]he alleged uses of the information here—'marketing, advertising, and analytics'—do not fall within the exception's narrow list of permissible uses." *Saunders*, 2024 WL 126186, at *4.

**E.  The VPPA "Marketing Exception" does not apply.**

Defendant also argues that its disclosure of its users' data falls under an exception for marketing under the VPPA. In order to make this argument, Defendant must ignore language in the statute and misconstrue the allegations in the Complaint. The "Marketing Exception" to which Defendant refers provides that:

> A video tape service provider may disclose personally identifiable information concerning any consumer . . . to any person if the disclosure is solely of the names and addresses of consumers and if—(i) the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and (ii) the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material; however, the subject matter of such materials may be disclosed if the disclosure is for the

exclusive use of marketing goods and services directly to the consumer.

18 U.S.C. § 2710(b)(2)(D). Neither of the required elements to this exception apply to

Defendant's disclosures as alleged in the Complaint. Further, even if both conditions of the

exception were met, Plaintiff plausibly alleges that Defendant discloses far more than is allowed.

Thus, for the exception to apply, Defendant must have provided Plaintiff "with the

opportunity, in a clear and conspicuous manner, to prohibit such disclosure." 18 U.S.C.

§ 2710(b)(2)(D). Defendant claims that the App satisfies this requirement because its privacy

policy instructs users how to opt out of data collection.[4] But the privacy policy contains only

hyperlinks, starting on the ninth page, to Google and Apple websites that provide instructions for

how to opt out of or withdraw consent for certain data collection generally. In other words,

Defendant does not provide an opportunity to prohibit disclosure—its policy merely directs users

to consult their devices' instructions on how to opt out of "receiving some type of ads and third-

party collection of data" and "the tracking of your device geolocation." Def.'s Mem. Ex. D (ECF

No. 47-4) at 9–10. This is far from *Defendant* providing a "conspicuous" opportunity to prohibit

disclosure.

But even if, *arguendo*, a link to third-party instructions regarding device settings satisfies

Defendant's obligation to provide an opportunity to prohibit disclosure—and even if placing that

link in the middle of a lengthy general privacy policy was sufficiently "clear and conspicuous"—

---

[4] Defendant asks the Court to consider their Privacy Policy, submitted as Exhibit D to the Greenbaum Declaration (ECF No. 47-4), but the Court should not consider this document since it falls outside of the four corners of the complaint, and it does not fall within an exception under *Watterson*, 987 F.2d at 3 (*i.e.*, the document is not "central to the [p]laintiff's claim" nor "sufficiently referred to in the complaint"). Further, Plaintiff disputes the authenticity of the document since it contains insufficient information to determine whether it was in effect during the relevant time period.

Plaintiffs allege in their Complaint that Plaintiff and many other users of Defendant's app are never presented with the Privacy Policy:

> Consumers who select "MAYBE LATER" are not presented with the App's Terms of Use or Privacy Policy. Even if a user selects "JOIN NOW," they are redirected to a login screen where they have the option to log in, but are not required to view or assent to any terms of use or privacy policy unless they take additional steps to create an account. Users who actually sign in or sign up for an account are never presented with a privacy policy from Defendant or otherwise that discloses that Defendant will share users' video-viewing histories with third parties.

Compl. ¶¶ 18–20.

Finally, even if the exception did apply in this case, Defendant notably omits *what* may be disclosed when the exception applies. If the exception applies, a provider may disclose *only* "the names and address of consumers." 18 U.S.C. § 2710(b)(2)(D) (emphasis added). In his Complaint, Plaintiff alleges that Defendant discloses far more than its consumers' names and addresses, such as their "location (in geographical coordinates and altitude), advertising ID, and video content consumption," including "what users are watching and where they are watching from." Compl. ¶¶ 22, 43, 51–52.[5] While the statute allows publishers to disclose specific video content "if the disclosure is for the exclusive use of marketing goods and services directly to the consumer," Defendant does not merely disclose a user's mailing address, but his or her precise

---

[5] Defendant tries to shoehorn in the App Store agreements as Exhibit C to the Greenbaum Declaration (ECF No. 47-3) even though Plaintiff only makes a passing reference to the availability of the App through the App Store. Thus, the App Store agreements does not fall under any exception under *Watterson* that would permit them to be considered on a motion to dismiss. Indeed, Defendant seeks to incorporate Exhibit C (ECF No. 47-3) for a wholly irrelevant discussion of the geographic restriction on radio broadcasts that is unrelated to the passing reference in the Complaint. *See Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (where the court excluded exhibits despite the complaint making "passing reference" to certain materials, because "the proposed exhibits consist of excerpts that are unrelated to any matter discussed in the complaint"). Further, Plaintiff contests the authenticity of Exhibit C on the basis that it is undated and lacks sufficient information to determine whether it was available during the relevant time period.

location each time he or she watches a video—regardless of where from. Defendant's disclosures

therefore exceed the scope of the marketing exception even if it did apply.[6]

**F. Plaintiff's claims are not time-barred.**

Defendant also contends that the two-year statute of limitations has run on Plaintiff's

claims because the Complaint alleges that Plaintiff downloaded the App in 2019 and the

Complaint was filed on February 1, 2024. But the Complaint alleges that Plaintiff "watched

multiple videos thereafter," and Defendant offers no support for its bold claim that it would be

"liberal construction" to assume that Plaintiff did not use the App after 2020. However, should

the Court be inclined to agree with Defendant, Plaintiff respectfully requests the opportunity to

amend or supplement the Complaint to add allegations concerning the timing of Plaintiff's use of

the App, which continued to 2024, and/or to name additional Plaintiffs who have also used the

App since February 1, 2022.

## CONCLUSION

Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied in its

entirety.

---

[6] Notably, Defendant does not affirmatively claim that it discloses specific video content *exclusively* for marketing purposes. Rather, Defendant relies on the fact that the Complaint does not specifically allege every way in which the disclosed data is used—something that cannot be thoroughly known without further discovery. *See Louth*, 2022 WL 4130866, at *4 ("It may be determined upon discovery that NFL Enterprises uses Anvato only for 'end-to-end video processing and management' functions, but, at this early pleading stage, the plaintiff sets forth a plausible case that it uses those services in violation of the VPPA."). Indeed, Defendant argues only that its disclosures fall under the exception "*[t]o the extent that* Rover allows the Patriots to target specific content to the appropriate fans." Def.'s Mem. at 20 (emphasis added).

Dated: June 14, 2024

Respectfully Submitted,

**BERMAN TABACCO**

*/s/ Nathaniel L. Orenstein*
Nathaniel L. Orenstein (BBO #664513)
Patrick T. Egan (BBO #637477)
Christina L. Gregg (BBO #709220)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
norenstein@bermantabacco.com
pegan@bermantabacco.com
cgregg@bermantabacco.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Joe E. Nelson
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: 612-333-8844
Fax: 612-339-6662
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
jnelson@gustafsongluek.com

Kenneth A. Wexler
Justin N. Boley
Zoran Tasić
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450,
Chicago, IL 60606
Tel: 312-346-2222
Fax: 312-346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com

Kevin Landau
Brett Cebulash
Joshua O. Hall
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A,
New York, NY 10038
Tel: 212-931-0704
klandau@tcllaw.com
bcebulash@tcllaw.com
jhall@tcllaw.com

*Attorneys for Plaintiff and the Proposed*
*Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filings (NEF). By agreement of the parties,

no paper copies will be sent to non-registered participants.

Dated: June 14, 2024                      */s/ Nathaniel L. Orenstein*
                                          Nathaniel L. Orenstein